## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| WEST REALM SHIRES, INC., | |
| Plaintiff, | |
| - against - | |
| MATTHEW NASS, MATTHEW PLACE, JOSHUA LEYTON, JOHN CONBERE, and LUIS SCOTT-VARGAS, | Adv. Pro. No. 24-_____(JTD) |
| Defendants. | |

## **COMPLAINT**

Debtor and debtor in possession West Realm Shires, Inc. ("WRS" or "Plaintiff"),

files this Complaint against Matthew Nass ("Nass" or "Interestholder Representative"), Matthew

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063, respectively. Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein. A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX. The principal place of business of Debtor Emergent Fidelity Technologies Ltd is Unit 3B, Bryson's Commercial Complex, Friars Hill Road, St. John's, Antigua and Barbuda.

Place ("Place"), Joshua Leyton ("Leyton"), John Conbere ("Conbere"), and Luis Scott-Vargas ("Scott-Vargas") (collectively the "Defendants," and each an "Interestholder") in connection with the pre-petition acquisition of Good Luck Games, LLC ("GLG") by the Plaintiff, and related payments to Defendants.  For its Complaint, Plaintiff alleges the following based upon personal knowledge and investigation to date, and upon information and belief as to all other matters.

## PRELIMINARY STATEMENT

1.      Samuel Bankman-Fried ("Bankman-Fried") and a group of insiders, including Zixiao "Gary" Wang ("Wang"), Nishad Singh ("Singh"), and Caroline Ellison ("Ellison"), (collectively, the "FTX Insiders") orchestrated and implemented a vast fraudulent scheme to enrich themselves and profit at the expense of the Debtors in these Chapter 11 bankruptcy cases (collectively, the "Chapter 11 Cases" and each a "Chapter 11 Case"), and their creditors.

2.      As has been detailed extensively in criminal indictments, prior complaints filed in civil lawsuits, and reports filed and issued by the FTX Debtors, the purported success of the FTX Group[2] was, in fact, fueled by a host of reckless and fraudulent practices perpetrated by, and for the benefit of, the FTX Insiders and their friends and family.

3.      These practices included, among other things, circumventing U.S. regulations and foreign law; misleading investors, business partners, financial institutions, and government bodies; vastly overpaying for assets and investments for the purpose of enriching the FTX Insiders and perpetuating their fraud, and making wildly speculative and unhedged bets in cryptocurrency assets—all of which was funded and paid for with commingled and misappropriated funds that

---

[2]      The term "FTX Group" means, collectively, the Debtors and all affiliates of the Debtors that have not filed voluntary Chapter 11 petitions in the United States under the Bankruptcy Code.

were diverted from the FTX Group through customer exchange deposits and "loans" between the FTX Group and the FTX Insiders that were never repaid.  Indeed, on November 2, 2023, having heard evidence of staggering embezzlement of billions of dollars of customer funds, it took a jury just three hours to find Bankman-Fried guilty on all counts.[3]

4.     In connection with this wide-ranging con game, the FTX Insiders facilitated the routing of billions of dollars to the FTX Insiders and their families, friends, and other acquaintances through purported bonuses, "investments," and all other means of transfer.

5.     This Complaint concerns one of those "investments": a $25 million payment to a group led by Bankman-Fried's godbrother and certain of his childhood friends, followed by millions more in salaries and "bonuses," all paid in purported exchange for a single video game that was never formally launched and did not even progress beyond beta-testing.  As with so many of the FTX Insiders' pre-petition "friends and family" investments and payments, there was never even a pretense that the Debtor was receiving reasonably equivalent value for its $25 million.

6.     The speed with which Defendants were unjustly enriched was, indeed, comical.  In late 2021, Bankman-Fried introduced certain FTX Insiders to several of his friends—including Nass, the godson of Bankman-Fried's parents—who had begun beta-testing the video game "Storybook Brawl," through their game studio GLG.  Moving swiftly to enrich Defendants, within little more than a week, FTX flew the GLG team to the Bahamas in a private jet.  Three days later,

---

[3]     Trial Tr. 3252:3–3254:24; MacKenzie Sigalos, *Three Hours to Guilty: How the Government Nailed Sam Bankman-Fried*, CNBC (Nov. 4, 2023), https://www.cnbc.com/2023/11/04/three-hours-were-all-the-jury-needed-to-convict-sam-bankman-fried.html.

Bankman-Fried announced that FTX would be acquiring Storybook Brawl for $25 million, and executed a term sheet.

7.    Shortly thereafter, GLG became a wholly owned subsidiary of WRS pursuant to a Merger Agreement, and Defendants received $22,076,740.63 in cash, 413,666 WRS shares, and offer letters with annual salaries of $200,000 each.  Although GLG never actually progressed past beta-testing Storybook Brawl or formally brought it or any game to market, Defendants continued to collect payments from WRS up through FTX's bankruptcy, including approximately $2 million in salary and purported bonuses over more than eight months—thereby essentially doubling their outsized annual salaries.

8.    Adding insult to injury—and underscoring that GLG's value was never anywhere near the $25 million WRS had been made to pay by the FTX Insiders, in March 2023 Defendant Nass submitted an indication of interest to buy back the Storybook Brawl game for a mere $1.4 million, before supplementing the offer with tenuous royalties that have never materialized.  That sale did not go through, and Defendants announced in April 2023 that Storybook Brawl, which remained GLG's only game under development, would be terminated.

9.    Plaintiff brings this adversary proceeding pursuant to Sections 544, 548, 550 and 105 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq*. (the "Bankruptcy Code"), and Sections 1304 and 1305 of Title 6 of the Delaware Code, Del. Code Ann. tit. 6, §§ 1304(a)(1)-(2) and 1305, to avoid and recover from Defendants all transfers of property of Plaintiff to Defendants that were made on or around March 1, March 18, March 31, April 15, April 29, May 13, May 31, June 15, June 30, July 15, July 29, August 15, August 31, September 15, September 30, October 14, and October 31, 2022, prior to commencement of the above-captioned Chapter 11 Cases.

Plaintiff further brings claims against Defendants for aiding and abetting breaches of fiduciary duty and aiding and abetting waste of corporate assets.

10.     During the course of this adversary proceeding, Plaintiff may learn (through formal discovery or otherwise) of additional transfers made, or obligations incurred, to Defendants that are avoidable under the Bankruptcy Code.  Plaintiff intends to avoid or recover all such transfers, and to avoid all such obligations, made to or for the benefit of Defendants or any other transferee and accordingly reserves the right to amend this Complaint.

## THE PARTIES

11.     Plaintiff and Debtor WRS is a Delaware corporation that was 52.99% owned by Bankman-Fried, 16.93% owned by Wang, 7.83% owned by Singh, and 22.25% owned by other shareholders.  It began operations in or around January 2020.  In the course of GLG's merger with WRS in 2022, WRS became the sole member of GLG, and GLG a wholly owned subsidiary of WRS.

12.     Defendant Nass is an individual who, upon information and belief, resides in Denver, Colorado.  Upon information and belief, Nass was a co-founder of GLG.  In the course of GLG's merger with WRS, Nass was an Interestholder who received a portion of the merger consideration.  Nass was a Manager on the Board of GLG, and was employed and received payments as "Design/Project Manager" for WRS.  Nass was elected the Interestholder Representative, and acted as agent and attorney-in-fact for all five individual Defendants who were Interestholders in GLG.

13.     Defendant Place is an individual who, upon information and belief, resides in Kansas City, Missouri.  Upon information and belief, Place was President  of GLG and co-founder of Storybook Brawl. In the course of GLG's merger with WRS, Place was an Interestholder who

received a portion of the merger consideration.  Place was a Manager on the Board of GLG, and was employed and received payments as Design Lead for WRS.

14.     Defendant Leyton is an individual who, upon information and belief, resides in Denver, Colorado.   In the course of GLG's merger with WRS, Leyton was an Interestholder who received a portion of the merger consideration, and was employed and received payments as a Design Engineer for WRS.

15.     Defendant Conbere is an individual who, upon information and belief, resides in Austin, Texas.  In the course of GLG's merger with WRS, Conbere was an Interestholder who received a portion of the merger consideration, and was employed and received payments as Lead Engineer for WRS.

16.     Defendant Scott-Vargas is an individual who, upon information and belief, resides in Denver, Colorado.   In the course of GLG's merger with WRS, Scott-Vargas was an Interestholder who received a portion of the merger consideration, and was employed and received payments as "Design/Marketing" for WRS.

**OTHER RELEVANT PERSONS**

17.     Bankman-Fried was a co-founder and Chief Executive Officer of WRS, a Delaware corporation in which he held a 52.99% ownership stake.  Additionally, Bankman-Fried was the President of GLG Merger Sub, LLC ("Merger Sub")—a Delaware limited liability company formed, upon information and belief, for the purpose of WRS's acquisition of GLG, which eventually became a wholly owned subsidiary of WRS.  In the course of GLG's merger with WRS, Bankman-Fried became a Manager on the Board of GLG.  Upon information and belief, Bankman-Fried was childhood friends with multiple Defendants.

18.     Singh and Wang were co-founders of WRS.

19.      Ellison was the co-CEO of Alameda Research LLC ("Alameda") from August 2021 until September 2022, when she was named the sole CEO and director.

20.      Each of Bankman-Fried, Singh, Wang, and Ellison, among others, was an FTX Insider.

21.      GLG, founded in 2019 by Defendants, was a Washington limited liability company. In 2021, GLG released its auto-battler game Storybook Brawl to early access beta-testers. Storybook Brawl was never formally released.

22.      In 2022, GLG merged with Merger Sub, the separate existence of which ceased, and GLG became the surviving entity and wholly owned subsidiary of WRS.

23.      In the course of the merger, Interestholders, including Defendants, were paid approximately $25 million in consideration comprised of cash and stock transfers—of which Defendants received approximately $22 million in cash, in addition to shares of WRS common stock.  In mid-2023, GLG announced that it would be shutting down.

## JURISDICTION AND VENUE

24.      On November 11 and November 14, 2022 (as applicable, the "Petition Date"), the Debtors filed with the United States Bankruptcy Court for the District of Delaware (the "Court") voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  On October 8, 2024, the Court entered an order confirming the Second Amended Joint Chapter 11 Plan of Reorganization of FTX Trading Ltd. and its Debtor Affiliates.  Chapter 11 Cases, D.I. 26404.

25.      Following entry of that order, and until the plan's effective date, the Debtors continue to operate their businesses and manage their properties as debtors-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, and Plaintiff has the authority to commence, and thereafter to prosecute, this adversary proceeding pursuant to Rule 7001 of the Federal Rules

of Bankruptcy Procedure because it seeks, among other things, to recover money or property belonging to the Debtors' Chapter 11 estates. Fed. R. Bankr. P. 7001(1).

26.     This adversary proceeding relates to the Chapter 11 Cases and the Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(a) and 1334(a) and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated February 29, 2012.

27.     This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (H), and the Court may enter final orders herein.

28.     Venue in this District is proper pursuant to 28 U.S.C. § 1409, and is consistent with the interests of justice, judicial economy, and fairness.

29.     The statutory predicates for the relief requested herein are Sections 544, 548, 550, and 105 of the Bankruptcy Code and Sections 1304 and 1305 of Title 6 of the Delaware Code.

30.     Pursuant to Rule 7008-1 of the Local Rules of Bankruptcy Practice and Procedure of the Court, Plaintiff consents to the entry of final orders and judgments by the Court on these claims to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments consistent with Article III of the United States Constitution.

## **FACTUAL BACKGROUND**

I.     **Bankman-Fried Defrauded Investors, Creditors, and Customers To Make Transfers to Defendants**

31.     Prior to the Petition Date, the FTX Group operated cryptocurrency exchanges and trading businesses. As explained in the First Day Declarations (defined below), the FTX Group faced a severe liquidity crisis that necessitated the filing of these Chapter 11 Cases on an emergency basis on November 11 and 14, 2022. Additional factual background relating to the FTX Group's businesses and the commencement of these Chapter 11 Cases is set forth in the

*Declaration of John J. Ray III in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 24], the *Declaration of Edgar W. Mosley II in Support of Chapter 11 Petitions and First Day Pleadings* [D.I. 57], the *Supplemental Declaration of John J. Ray III in Support of First Day Pleadings* [D.I. 92], and the *Supplemental Declaration of Edgar W. Mosley II in Support of First Day Pleadings* [D.I. 93] (collectively, the "First Day Declarations").

32.     Bankman-Fried along with the other FTX Insiders, took advantage of the FTX Group's lack of controls and recordkeeping to perpetrate a massive fraud—lavishly spending the FTX Group's assets on, among other things, his self-aggrandizement, real estate, travel, and various pet projects and unsound investments.

33.     Bankman-Fried spearheaded negotiations with GLG and facilitated the transfers to Defendants to benefit his childhood friends.  Bankman-Fried made these multimillion dollar transfers using customers' and investors' money, with insufficient due diligence, and on terms that enriched Defendants personally, but that prevented the Plaintiff from receiving reasonably equivalent value in exchange for the transfers.

## II.     Defendants Leveraged Their Close Personal Friendships With Bankman-Fried To Obtain Millions of Dollars In Cash, And Stock Transfers

34.     Defendant Nass, co-founder of GLG, is Bankman-Fried's godbrother.  When Nass's father—a Stanford professor—died in 2013, Bankman-Fried's parents offered him a place to live.  Nass lived with them for several years, publicly stating that he "thought of them as parents."[4]

---

[4]     Justin Baer and Hardika Singh, *Sam Bankman-Fried's Parents Were There for His Rise and Now They're There for His Fall*, FN London (Dec. 13, 2022), https://www.fnlondon.com/articles/sam-bankman-fried-parents-ftx-crypto-20221213.

35.    Defendant Place and Bankman-Fried appear likewise to have known each other since childhood.  Bankman-Fried indeed specifically tweeted that he has "known the team behind [Storybook Brawl] since middle school; we grew up drafting Magic: The Gathering at the same shops."[5]

36.    Having launched GLG in 2019, Defendants began developing the game Storybook Brawl in February 2020.  Storybook Brawl appears to have been GLG's only game in 2021, when it was released to early access beta-testers, and was later given an expected general release date of 2023.

37.    On November 30, 2021, Bankman-Fried introduced Nass as "cofounder of Storybook Brawl" and a "close friend of mine," to a group of FTX Insiders, including Wang, Singh, and other FTX employees.

38.    Barely a week later, FTX flew the GLG team (Nass, Place, and Leyton) to the Bahamas via private jet, where purported "negotiations" with Defendants were scheduled to take place in person between December 8 and December 14, 2021.   On December 11, 2021, a mere three days after the GLG team arrived in the Bahamas, Bankman-Fried announced in the Private Ventures Slack Channel: "We have agreed to acquire Storybook Brawl! $25m. Will likely be FTX US."  The same day, Bankman-Fried and Nass signed a one-page term sheet regarding the main points of the acquisition.

**The $25 Million Payment from WRS to GLG**

---

[5]    Sam Bankman-Fried (@SBF), Twitter (Mar. 22, 2022, 12:24 PM), https://twitter.com/SBF_FTX/status/1506305832933281792.

39.     Bankman-Fried's contemporaneous notes acknowledge that—for their work on this single video game—*in addition* to the $25 million to be paid to GLG's Interestholders in cash or WRS equity of their choosing, Defendants would not only receive "standard salaries," but on top of that would also be eligible for "periodic discretionary bonuses," which could be above "7 figures per year."

40.     Bankman-Fried's notes also contemplated that WRS would offer Defendants even more, in the form of "substantial funding" that would be "available freely" and that "[t]here won't be any hard guidelines on this amount," which was "anticipated to be in the 7 or 8 figures per year."

41.     To facilitate FTX's acquisition of GLG, on February 23, 2022, WRS formed Merger Sub, a Delaware limited liability company.   On March 1, 2022, WRS, Merger Sub, GLG, Nass as the Interestholder Representative, as well as the remaining Interestholders, including Defendants, entered into the Agreement and Plan of Merger (the "Merger Agreement").   The Merger Agreement collectively defines the five individual Defendants as "Key Members."

42.     Pursuant to the Merger Agreement, Merger Sub merged with GLG and ceased to exist, leaving GLG as the surviving entity and a wholly owned subsidiary of WRS.

43.     Pursuant to Section 1.8 and Annex I of the Merger Agreement, the Interestholders, including Defendants, received cash merger consideration, as well as shares of WRS common stock.   Specifically, as set forth in **Exhibit A** below, the Interestholder Defendants received:

- **$22,076,740.63** in cash merger consideration, equal to: $24,054,770, minus GLG's indebtedness ($33,663) and transaction expenses ($63,697), minus an advance amount to Nass, the Interestholder Representative ($100,000); and less the cash merger consideration of the remaining Interestholders.

- **413,666 shares** of WRS Common Stock in stock merger consideration.

44.     Total consideration was rounded to $25 million in the deal documents.

45.     Pursuant to Section 7.1 of the Merger Agreement, Nass was appointed Interestholder Representative, as agent and attorney-in-fact of the Interestholders, and received the $100,000 advance amount to keep in a separate account in that capacity.

46.     On March 1, 2022, as memorialized in a Flow of Funds Memorandum to the Merger Agreement, the above transfers were issued to Defendants.  To accelerate payment of these substantial amounts to Defendants, Section 1.9 of the Merger Agreement provided the "Closing Date" was to occur "simultaneously with the execution and delivery of this Agreement."

47.     On the same day, "Offer Letters" were also sent to each Defendant, committing $200,000 in annual salary, together with a discretionary bonus "from time to time."

48.     Although WRS retained a number of legal advisers in connection with the GLG transaction, the diligence performed on GLG was only cursory and did not focus on transaction economics or audited financials.  There is, indeed, no evidence that GLG even provided business plans or financial projections sufficient for WRS to assess the acquisition price.

49.     At closing, GLG's cash balance was only $15,494.99 and its Fixed Assets were valued at $277,198.  GLG's only other asset was the intellectual property of the Storybook Brawl videogame.  When the game went into early access beta-testing in 2021, GLG licensed Storybook Brawl to a website on which users could play the game for free.  During that year, GLG earned around $200,000 in revenue from this licensing arrangement.  According to a Purchase Accounting Memorandum prepared for the transaction, there were no other customer relationships or any other identifiable intangible assets of GLG.

50.     WRS did not receive reasonably equivalent value in exchange for any of its transfers to Defendants—a fact that Bankman-Fried, other FTX Insiders, and Defendants concealed from FTX's creditors and investors.

**III.    Defendants Continued to Collect Payments From WRS Through GLG Even After They Received a $25 Million "Friends and Family" Windfall**

51.    On top of WRS's payment of $25 million for GLG, over the course of more than eight months—between March and October 2022—Defendants also received approximately $2 million more from WRS in purported "payroll."

52.    Despite Defendants' offer letters setting their annual salaries at $200,000, Debtor records indicate that WRS generally paid Defendants bonuses that more than doubled their salary, annualized between March and October in 2022.  Indeed, in the month of September 2022 alone, WRS collectively issued them over $1.2 million in "payroll" payments of salary and bonus.

53.    Specifically, as set forth in **Exhibit B** and **Exhibit D**, through WRS's payroll services:

- Nass received over $19,000 in March 2022, over $20,000 every month between April and August 2022, over $288,000 in September 2022, and then over $18,000 in October 2022, for a total of more than $429,000—on top of his more than $7,000,000 in cash merger consideration.

- Place received over $19,000 in March 2022, over $21,000 every month between April and August 2022, over $288,000 in September 2022, and then over $19,000 in October 2022, for a total of more than $436,000—on top of his more than $6,600,000 in cash merger consideration.

- Leyton received over $18,000 in March 2022, over $20,000 every month between April and August 2022, nearly $280,000 in September 2022, and then over $18,000 in October 2022, for a total of more than $418,000—on top of his more than $3,600,000 in cash merger consideration.

- Conbere received over $19,000 in March 2022, over $20,000 every month between April and August 2022, nearly $250,000 in September 2022, and then over $18,000 in October 2022, for a total of more than $388,000—on top of his more than $2,100,000 in cash merger consideration.

- Scott-Vargas received over $18,000 in March 2022, over $20,000 every month between April and August 2022, nearly $200,000 in September 2022, and then over $20,000 in October 2022, for a total of more than $336,000—on top of his more than $2,300,000 in cash merger consideration.

54.     In response to the bonuses Defendants received in September 2022, Defendant Scott-Vargas understandably exclaimed, "Fucking sick these bonuses lol," followed immediately by, "Amazing[.]"  Indeed, Place commented on a different occasion regarding these bonuses: "[s]uch a fortunate situation we are in!"  Nass then remarked, "so fun being [S]anta."

55.     WRS also made large "payroll" transfers to more than 20 individuals associated with GLG—some of whom were friends and relatives of Defendants.  Ahead of the September 2022 bonuses, for example, an individual—who is upon information and belief Scott-Vargas's brother—received an $18,000 bonus despite a salary of only $50,000.

56.     In total, Bankman-Fried, other FTX Insiders, and Defendants acted together to remove more than $24,086,428 from FTX's investors and creditors through WRS to Defendants alone through the GLG merger, as well as post-merger payments from Defendants, as set forth in **Exhibit C**.

## IV.   Defendants' Post-Bankruptcy Activities Demonstrate WRS Did Not Receive Equivalent Value

57.     On November 11, 2022, the same day that, as part of the larger FTX bankruptcy filing, GLG filed for bankruptcy, Nass sent an e-mail to legal counsel, outside consultants, and FTX, explaining that the GLG team was working to find potential purchasers for GLG, and noting that the Storybook game "is still pre-launch and makes very little revenue ($200k total)".  The former owners of GLG, led by Nass, submitted a letter of intent in March 2023 to buy back the company for a mere $1.4 million, inclusive of liabilities.

58.     The sale did not ultimately take place.  Though on April 10, 2023, Defendants (through Nass) nominally offered to "pay Seller up to $25,000,000," that amount would be "inclusive of the Royalty Payments": that is, $23,600,000 of that amount would be paid to FTX,

if ever, only as a royalty (10% of net revenue from Storybook Brawl).[6]  At that royalty rate, Storybook Brawl would need to generate $236 million in revenue to fulfill Defendants' putative $25 million purchase price—an unrealistic outcome for a game that has not even formally launched.  As before, such a sale would constitute $1.4 million, inclusive of liabilities.  Debtor did not agree to such a transaction.  On April 25, 2023, Defendants announced via X, formerly known as Twitter, that Storybook Brawl would be shutting down its servers on May 1, 2023.[7]

59.     In November 2023 and October 2024, Nass again sought to repurchase GLG, upon information and belief for a fraction of the $25 million the GLG Interestholders received in March 2022.  Debtor has not agreed to Defendants' self-serving offers to buy GLG back and retain the tens of millions Defendants obtained by means of fraudulent transfer in 2022.

## V.     Plaintiff Was Insolvent At All Relevant Times

60.     Plaintiff was insolvent at all relevant times.  As alleged in the superseding indictment of Bankman-Fried, the FTX empire was built on a house of cards.  "From at least in or about 2019, up to and including in or about November 2022," Bankman-Fried "corrupted the operations of the cryptocurrency companies he founded and controlled ... through a pattern of fraudulent schemes ...."  Superseding Indictment ¶ 1, *United States v. Bankman-Fried*, No. 22-cr-00673 (LAK) (S.D.N.Y. Feb. 23, 2023), ECF No. 80.

---

[6]     Specifically, the April 10, 2023, letter of intent provided that "Buyer will pay Seller a royalty of ten percent (10%) of Buyer's Net Revenue (the "Royalty") *up to* $23,600,000 in Royalties and five percent (5.0%) thereafter." (emphasis added).

[7]     Emily Nicole and Cecila D'Anastasio, *Sam Bankman-Fried's Favorite Video Game is Shutting Down*, Bloomberg (April 25, 2013), https://www.bloomberg.com/news/articles/2023-04-25/sam-bankman-fried-s-favorite-game-storybook-brawl-to-close-post-ftx-bankruptcy?embedded-checkout=true.

61.     The FTX Insiders failed to implement virtually any of the systems or controls necessary for companies entrusted with customer money or other assets.  The FTX Insiders concealed the FTX Group's failing and insolvent state by raiding and misappropriating billions of dollars in cash, cryptocurrency, and other assets deposited by customers.  The FTX Insiders and FTX Group senior management accomplished this through multiple deceptions, including lying to customers about the segregation and safety of their accounts, and creating a series of secret mechanisms by which assets could be transferred within the FTX Group's capital structure, and, ultimately, out of the FTX Group's custody.  As alleged in the indictment, Bankman-Fried's "multi-billion-dollar fraud" was executed "through a series of systems and schemes that allowed" Bankman-Fried and other FTX Insiders "to access and steal FTX customer deposits without detection." *Id.* ¶ 4.

62.     From the beginning of the FTX.com exchange, funds that customers intended to be deposited on the exchange in fact were deposited with Alameda.  At the same time, although the FTX Group's exchange software generally did not allow for an account on the exchange to carry a negative balance, in or around July 2019, Bankman-Fried directed one or more of his co-conspirators or individuals working at their behest to modify the exchange software to permit Alameda to maintain a negative balance in its account on the exchange, including modifying settings in the exchange software known as "borrow," "can_withdraw_below_borrow," and "allow_negative."

63.     Through these cheats, Alameda was not only able to evade collateralizing its position on the exchange; it also was able to maintain a negative balance on the exchange and utilize the exchange to trade and withdraw assets without limit, giving it a virtually unlimited "line of credit" collateralized by the customer deposits on the exchange.  As of the commencement of

the Chapter 11 Cases, the exchange's software had been tampered with to an extent sufficient to expand Alameda's "line of credit" to $65 billion.  Alameda lacked the ability to repay this line of credit, having spent the money on insider transfers and purported "loans," gifts, and questionable investments, including the purchase of GLG.

64.     FTX Insiders' insatiable need for funds was not limited to propping up Alameda in the face of extreme risk and management failures. Bankman-Fried and other FTX Insiders needed funds to pay for billions of dollars in ill-conceived and outright fraudulent transfers. The FTX Group's improper outflows and expenditures are staggering.  Billions of dollars were wasted on overpriced assets and investments that were worth only a fraction of the amounts invested.  Billions of dollars were also spent on purported  "loans," gifts, and other transfers to Bankman-Fried, other senior management, their friends and families, and political contributions, which rendered Plaintiff insolvent at all relevant times, including when the subject transfers were made on March 1, March 18, March 31, April 15, April 29, May 13, May 31, June 15, June 30, July 15, July 29, August 15, August 31, September 15, September 30, October 14, and October 31, 2022.

65.     In the early hours of November 11, 2022, Bankman-Fried signed a document turning over control of the FTX Group to John J. Ray III.

66.     On November 11 and 14, 2022, the Debtors filed for Chapter 11 bankruptcy, commencing the Chapter 11 Cases.

67.     The FTX Insiders' conduct has been the subject of criminal proceedings initiated by federal prosecutors and actions brought by the Securities and Exchange Commission ("SEC"), the Commodity Futures Trading Commission ("CFTC"), and investigations by a host of regulators. Guilty pleas entered by certain FTX Insiders have confirmed that they and other FTX Insiders engaged in a fraudulent scheme and other criminal acts in their operation of the Debtors.  FTX

Insiders, except for Bankman-Fried, have pleaded guilty to crimes perpetrated through the very practices that underlie this action.

68.    On December 19, 2022, Wang pleaded guilty to wire fraud and aiding and abetting the same, conspiracy to commit wire fraud, conspiracy to commit commodities fraud, and conspiracy to commit securities fraud.  In connection with his plea, Wang admitted that in 2019 he made "certain changes to [the FTX.com] code" to give Alameda  "special privileges on the FTX platform," including to allow Alameda unfettered use of assets on the FTX.com exchange, even while Alameda maintained negative balances in its own holdings of fiat (*i.e.,* government-issued) currencies and cryptocurrencies.[8]   Using these "special privileges," the FTX Insiders frequently caused Alameda to misappropriate funds from the FTX.com exchange for their own benefit.

69.    Also on December 19, 2022, Ellison pleaded guilty to two counts of wire fraud and aiding and abetting the same, two counts of conspiracy to commit wire fraud, conspiracy to commit commodities fraud, conspiracy to commit securities fraud, and conspiracy to commit money laundering.[9]

70.    The SEC charged Wang and Ellison in a parallel proceeding, alleging, among other things, that they manipulated the price of FTT, an FTX.com-issued exchange crypto security token.[10]   Ellison and Wang entered into consent orders with the CFTC as to their liability for

---

[8]    Wang Plea Agreement (Information & Waiver of Indictment) and Plea Tr. 24:6-10, *United States v. Wang*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF Nos. 6–7, 21.

[9]    Ellison Plea Agreement (Information & Waiver of Indictment), *United States v. Ellison*, No. 22-cr-00673 (S.D.N.Y. Dec. 19, 2022), ECF Nos. 8–9.

[10]    *Securities and Exchange Commission v. Ellison and Wang*, No. 1:22-cv-10794 (S.D.N.Y. Dec. 21, 2022).

engaging in fraud in violation of Section 6(c)(1) of the Commodity Exchange Act and CFTC Regulation 180.1.[11]

71.     On February 28, 2023, Singh pleaded guilty to wire fraud and aiding and abetting the same, and five conspiracy charges, including conspiracy to commit securities fraud, conspiracy to commit money laundering, and conspiracy to violate federal campaign finance laws.[12]

72.     On December 9, 2022, the U.S. Attorney's Office for the Southern District of New York indicted Bankman-Fried, charging him with two counts of wire fraud, as well as four counts of conspiracy to commit wire fraud, securities, and commodities fraud, conspiracy to commit money laundering, and conspiracy to defraud the United States and violate campaign finance laws.[13]  As alleged in a Third Superseding Indictment, filed on August 14, 2023, Bankman-Fried conspired to and actually did commit wire fraud, and conspired to commit securities fraud, commodities fraud, and money laundering.[14]  On November 2, 2023, after approximately three hours of deliberation, the jury in the criminal case found Bankman-Fried guilty on all seven counts of fraud, conspiracy, and money laundering.[15]  Bankman-Fried was sentenced to 25 years in prison on March 28, 2024.

---

[11]     CFTC, *Press Release Caroline Ellison and Gary Wang Acknowledge Liability* (Dec. 21, 2022), https://www.cftc.gov/PressRoom/PressReleases/8644-22.

[12]     Singh Plea Agreement (Superseding Information & Waiver of Indictment), *United States v. Singh*, No. 22-cr-00673 (S.D.N.Y. Feb. 28, 2023), ECF Nos. 90–91.

[13]     *See* Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Dec. 9, 2022), ECF No. 1.  The Government withdrew its charge of conspiracy to defraud the United States and violate campaign finance laws.

[14]     *See* Third Superseding Indictment, *United States v. Bankman-Fried*, No. 22-cr-00673 (S.D.N.Y. Aug. 14, 2023), ECF No. 202.

[15]     Trial Tr. 3252:3–3254:24; *see, e.g.,* MacKenzie Sigalos, *Sam Bankman-Fried Found Guilty on All Seven Criminal Fraud Counts*, CNBC (Nov. 3, 2023),

73.     Without accounting for the distorting effects of Bankman-Fried and the FTX Insiders' staggering fraud, at all relevant times the FTX Group liabilities far exceeded the fair value of their assets and the FTX Group lacked sufficient cash, cryptocurrency, and other assets to cover customer accounts and their creditors' claims, leaving it inadequately capitalized and with an inability to pay its debts as they came due.  This was an insolvency further deepened by the additional civil and criminal liabilities imposed on the FTX Group, by Bankman-Fried, and the FTX Insiders' fraudulent conduct.

74.     Similarly, the majority of WRS's assets during the relevant period included receivables from other entities within the FTX Group, which for the reasons set forth above had no chance of being repaid given the FTX Group's insolvency and ongoing fraudulent conduct by the FTX Insiders.  WRS's assets also included investments by FTX Insiders into tenuous and speculative ventures, which were worth only a fraction of the amounts invested.  As a result, the size of WRS's liabilities greatly exceeded the fair value of its assets, during the relevant periods.

75.     Plaintiff also had inadequate and unreasonably small capital to operate its businesses.  Plaintiff continued to operate only because the FTX Insiders continually concealed and lied about its financial condition.  The same is true of the FTX Group generally, and it was insolvent at all relevant times.

---

https://www.cnbc.com/2023/11/02/sam-bankman-fried-found-guilty-on-all-seven-criminal-fraud-counts.html.

## CAUSES OF ACTION

### COUNT ONE
### CONSTRUCTIVE FRAUDULENT TRANSFERS PURSUANT TO
### 11 U.S.C. § 548(a)(1)(B)

76.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 75 as if fully set forth here.

77.     Plaintiff made the merger consideration transfers to Defendants addressed herein on or around March 1, 2022, as more specifically described in **Exhibit A**, and then salary and bonus transfers on March 18, March 31, April 15, April 29, May 13, May 31, June 15, June 30, July 15, July 29, August 15, August 31, September 15, September 30, October 14, and October 31, 2022, as more specifically described in **Exhibit B**.  Each of the transfers to Defendants was a transfer of property of Plaintiff.

78.     Plaintiff did not receive reasonably equivalent value in exchange for any of the transfers.

79.     Plaintiff (1) was insolvent on the date that each was made; (2) became insolvent as a result of these transfers; (3) was engaged in a business or a transaction for which any property remaining with the Plaintiff was an unreasonably small capital; or (4) intended to incur, or believed that it would incur, debts that would be beyond the Plaintiff's ability to repay as such debts matured.

80.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Section 548(a)(1)(B) of the Bankruptcy Code, and Plaintiff may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

**COUNT TWO**
**CONSTRUCTIVE FRAUDULENT TRANSFERS PURSUANT TO**
**DEL. CODE ANN. TIT. 6, §§ 1304(a)(2) AND 1305 AND 11 U.S.C. § 544(b)**

81.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 75 as if fully set forth here.

82.     Section 544(b) of the Bankruptcy Code authorizes Plaintiff to avoid any transfer of an interest in their property that is voidable under applicable law by a creditor holding an allowable unsecured claim.   Accordingly, pursuant to Bankruptcy Code Section 544(b), the fraudulent transfers are avoidable under the Delaware Uniform Fraudulent Transfer Act, Del. Code Ann. tit. 6, § 1301, *et seq*.

83.     Plaintiff made the transfers to Defendants addressed herein on or around March 1, 2022, as more specifically described in **Exhibit A**, and then salary and bonus transfers on March 18, March 31, April 15, April 29, May 13, May 31, June 15, June 30, July 15, July 29, August 15, August 31, September 15, September 30, October 14, and October 31, 2022, as more specifically described in **Exhibit B**.  Each of the transfers to Defendants was a transfer of property of Plaintiff.

84.     Plaintiff did not receive reasonably equivalent value in exchange for any of these transfers.

85.     Plaintiff  (1) was insolvent on the date that each transfer was made; (2) became insolvent as a result of these transfers; (3) engaged or was about to engage in a business or a transaction for which the remaining assets of the Plaintiff were unreasonably small in relation to the business or transaction; or (4) intended to incur, believed that it would incur, or reasonably should have believed that it would incur debts that would be beyond the Plaintiff's ability to repay as such debts became due.

86.     Each of the transfers is avoidable by creditors who hold allowable unsecured claims, including creditors who were creditors before the transfers.

87.     Accordingly, each of these transfers should be avoided as fraudulent pursuant to Del. Code Ann. tit. 6, §§ 1304(a)(2) and 1305, and 11 U.S.C. § 544(b), and Plaintiff may recover from Defendants the full amount of such transfers, plus interest from the relevant dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT THREE
### PROPERTY RECOVERY PURSUANT TO 11 U.S.C. § 550(a)(1)

88.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 75 as if fully set forth here.

89.     As alleged above, Plaintiff is entitled to avoid each of the transfers to Defendants addressed herein under Sections 544 and 548 of the Bankruptcy Code.

90.     Because Defendants are the initial transferees for whose benefit such transfers were made, Plaintiff may recover from Defendants the full value of the transfers pursuant to 11 U.S.C. § 550(a)(1), plus interest from the transfer dates, and costs and fees to the extent available, for the benefit of the Debtors' bankruptcy estates.

### COUNT FOUR
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

91.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 75 as if fully set forth here.

92.     At all relevant times, Bankman-Fried was the Chief Executive Officer of WRS and owed fiduciary duties to WRS under Delaware law, including duties of care, loyalty, honesty, and disclosure.  Bankman-Fried was required to act in WRS's best interests, and not for his personal benefit. Defendants knew that Bankman-Fried owed such duties to WRS.

93.     By causing Plaintiff to make the transfers to each of the Defendants, in exchange for which WRS did not receive, and had virtually no prospect of receiving, reasonably equivalent value, and from which Defendants, Bankman-Fried's childhood friends, personally benefited, Bankman-Fried breached his fiduciary duties to WRS.

94.     Defendants knew that the transfers did not provide and had virtually no prospect of providing WRS with reasonably equivalent value because there was no feasible financial prospect of GLG's Storybook Brawl project generating sufficient revenue to justify WRS's outsized investment.  Defendants also knew that Bankman-Fried personally benefited from the transfers by benefiting Defendants, his childhood friends. Defendants thus knowingly participated in Bankman-Fried's breaches of fiduciary duty to WRS.

95.     As a result of Bankman-Fried's breaches of fiduciary duty, and Defendants' aiding and abetting that breach, WRS suffered damages in the aggregate amount of the transfers to the Defendants.

**COUNT FIVE**
**AIDING AND ABETTING WASTE OF CORPORATE ASSETS**

96.     Plaintiff repeats and realleges the allegations in paragraphs 1 through 75 as if fully set forth here.

97.     At all relevant times, Bankman-Fried was the Chief Executive Officer of WRS, which became the sole member of GLG (itself a wholly owned subsidiary of WRS).  As such, Bankman-Fried authorized and facilitated the waste of assets that the investment into GLG represented.

98.     By causing WRS to transfer over $24 million, as set forth in **<u>Exhibit C</u>**, in cash and stock merger consideration, as well as in salary and outsized bonuses to Defendants, in exchange for which WRS did not receive and had virtually no prospect of receiving reasonably equivalent

value, and from which Bankman-Fried's childhood friends (and therefore Bankman-Fried) personally benefited, Defendants aided and abetted Bankman-Fried in this corporate waste by inducing him to cause WRS to invest into GLG at an inflated valuation.

99.     As a direct and proximate result of the foregoing, Plaintiff was damaged in an amount to be determined at trial.

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully prays that this Court:

100.     Enter an order that the transfers to Defendants addressed herein are avoidable fraudulent transfers under 11 U.S.C. §§ 544 and 548 and Del. Code Ann. tit. 6, §§ 1304 and 1305;

101.     Enter an order that Defendants aided and abetted Bankman-Fried's breach of his fiduciary duties to WRS, and award damages to be paid in an amount to be determined by this Court;

102.     Enter an order that Defendants aided and abetted Bankman-Fried's waste of WRS corporate assets, and award damages to be paid in an amount to be determined by this Court;

103.     Award Plaintiff under 11 U.S.C. § 550 no less than $24,086,428.86 plus the value of any additional avoidable transfers that Plaintiff learns, through formal discovery or otherwise, were made to Defendants;

104.     Award Plaintiff its attorneys' fees, pre- and post-judgment interests, and costs of suit; and

105.     Award Plaintiff all other relief, at law or equity, to which it may be entitled.

Dated: November 8, 2024
       Wilmington, Delaware

**LANDIS RATH & COBB LLP**

*/s/ Matthew B. McGuire*
Adam G. Landis (No. 3407)
Richard S. Cobb (No. 3157)
Matthew B. McGuire (No. 4366)
Howard W. Robertson IV (No. 6903)
919 Market Street, Suite 1800
Wilmington, Delaware 19801
Telephone: (302) 467-4400
Facsimile: (302) 467-4450
E-mail:  landis@lrclaw.com
         cobb@lrclaw.com
         mcguire@lrclaw.com
         robertson@lrclaw.com

*Counsel for the Debtors and Debtors-in-Possession*

**QUINN EMANUEL URQUHART & SULLIVAN, LLP**

Sascha N. Rand (*pro hac vice*)
Isaac Nesser (*pro hac vice*)
Heather Christensen (*pro hac vice*)
51 Madison Avenue, 22nd Floor
New York, New York 10010
(212) 849-7000
sascharand@quinnemanuel.com
isaacnesser@quinnemanuel.com
heatherchristenson@quinnemanuel.com

Matthew Scheck (*pro hac vice*)
300 West 6th St, Suite 2010
Austin, Texas 78701
matthewscheck@quinnemanuel.com

Marina Lev (*pro hac vice*)
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
marinalev@quinnemanuel.com

*Special Counsel to the Debtors*