## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| FTX TRADING LTD., *et al.*,[1] | Case No. 22-11068 (JTD) |
| Debtors. | (Jointly Administered) |
| WEST REALM SHIRES SERVICES INC., | |
| Plaintiff, | |
| v. | |
| MATTHEW NASS, MATTHEW PLACE, JOSHUA LEYTON, JOHN CONBERE, and LUIS SCOTT-VARGAS, | Adv. Pro. No. 24-50210 (JTD) |
| Defendants. | |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
## MOTION TO DISMISS COUNTS FOUR AND FIVE OF THE COMPLAINT

**MONTGOMERY McCRACKEN**
**WALKER & RHOADS LLP**

Marc J. Phillips (No. 4445)
1105 North Market Street, 15th Floor
Wilmington, Delaware  19801
Telephone:  (302) 504-7800
mphillips@mmwr.com

Jeremy D. Mishkin
(admitted *pro hac vice*)
1735 Market Street, 20th Floor
Philadelphia, Pennsylvania  19103
Telephone:  (215) 772-7246
jmishkin@mmwr.com

*Attorneys for Defendants*

Dated:  January 8, 2025

---

[1] The last four digits of FTX Trading Ltd.'s and Alameda Research LLC's tax identification number are 3288 and 4063 respectively.  Due to the large number of debtor entities in these Chapter 11 Cases, a complete list of the Debtors and the last four digits of their federal tax identification numbers is not provided herein.  A complete list of such information may be obtained on the website of the Debtors' claims and noticing agent at https://cases.ra.kroll.com/FTX.

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................................................. 1

PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT ...................................... 1

NATURE AND STAGE OF PROCEEDINGS ............................................................................ 4

I.     STATEMENT OF FACTS ................................................................................................ 4

II.    ARGUMENT ..................................................................................................................... 9

      A.    Legal Standard ...................................................................................................... 9

      B.    Count Four:  Plaintiff has not plausibly alleged that any one of the five individual defendants aided and abetted any breach of fiduciary duty ................. 10

            1.    Count Four should be dismissed because Plaintiff lumps all the Defendants together and thus does not satisfy the pleading standard under F.R.C.P. 8 ..................................................................................... 10

            2.    Count Four should also be dismissed because Plaintiff does not plausibly allege that any of the Defendants "knowingly participated" in a breach of fiduciary duty. ........................................... 13

                  a.    Plaintiff does not plead that any Defendant substantially assisted any breach of fiduciary duty. .......................................... 14

                  b.    Plaintiff does not plead that any Defendant knew that any conduct was improper. ................................................................. 16

      C.    Count Five:  Aiding and Abetting Waste of Corporate Assets ............................ 18

III.   CONCLUSION ................................................................................................................ 20

# TABLE OF AUTHORITIES

**Page(s)**

Other Authorities

*Adverio Pharma GmbH v. Alembic Pharms. Ltd.*,
　C. A. No. 18-73-LPS, 2019 WL 581618 (D. Del. Feb. 13, 2019)　　　13, 14

*Ashcroft v. Iqbal*,
　556 U.S. 662 (2009)　　　5, 11

*Barbagallo v. Marcum LLP*,
　820 F. Supp. 2d 429 (E.D.N.Y. 2011)　　　4

*Bell Atlantic Corp. v. Twombly*,
　550 U.S. 544 (2007)　　　11

*Capitaliza-T Sociedad De Responsabilidad Limitada De Cap. Variable v. Wachovia Bank of
　Delaware N*at. Ass'n,
　No. CIV. 10-520 JBS KMW, 2011 WL 864421 (D. Del. Mar. 9, 2011)　　　24

*Chester Cty. Employees' Ret. Fund v. New Residential Inv. Corp.*,
　2016 WL 5865004 (Del. Ch. Oct. 7, 2016)　　　18

*ECB USA, Inc. v. Savencia, S.A.*,
　No. CV 19-731-RGA-CJB, 2020 WL 11762200 (D. Del. July 10, 2020)　　　15

*Gortat v. Capala Bros., Inc.*,
　257 F.R.D. 353 (E.D.N.Y. 2009)　　　4

*In re Alchemy, LLC*,
　2019 WL 4447541 (Bankr. D. Del. Sept. 16, 2019)　　　18

*In re Am. Bus. Fin. Servs., Inc.*,
　360 B.R. 74 (Bankr. D. Del. 2007)　　　22

*In re Conex Holdings, LLC*,
　514 B.R. 405 (Bankr. D. Del. 2014)　　　14

*In re Cred Inc.*,
　650 B.R. 803 (Bankr. D. Del. 2023)　　　12, 21

*In re Furniture Factory Ultimate Holding, L.P.*,
　No. 20-12816 (JKS), 2023 WL 5662747 (Bankr. D. Del. Aug. 31, 2023)　　　14

*In re Live Well Fin., Inc.*, No.,
　19-11317 (LSS), 2023 WL 4025816 (Bankr. D. Del. June 14, 2023)　　　11

# TABLE OF AUTHORITIES

**Page(s)**

*In re Mindbody, Inc., Stockholder Litig.*,
　No. 484, 2023, 2024 WL 4926910 (Del. Dec. 2, 2024) ............... 19, 20, 21, 22

*In re Oracle Corp. Derivative Litig.*,
　No. CV 2017-0337-SG, 2020 WL 3410745 (Del. Ch. June 22, 2020) ...... 19, 20, 21

*In re Troll Comm'cns, LLC*,
　385 B.R. 110 (Bankr. D. Del. 2008) ............... 15

*In re Tropicana Ent., LLC*,
　520 B.R. 455 (Bankr. D. Del. 2014) ............... 11

*In re World Health Alts. Inc.*,
　385 B.R. 576 (Bankr. D. Del. 2008) ............... 28, 29

*Jacobs v. Meghji*,
　No. CV 2019-1022-MTZ, 2020 WL 5951410 (Del. Ch. Ct. Oct. 8, 2020) ...... passim

*Ltd. v. Expedia, Inc. (DE)*, C.A. No. 16-581-RGA-MPT,
　2017 WL 896988 (D. Del. Mar. 7, 2017) ............... 12

*M2M Sols. LLC v. Telit Commc'ns PLC*,
　C.A. No. 14-1103-RGA, 2015 WL 4640400 (D. Del. Aug. 5, 2015) ...... 13

*Maass v. Lee*,
　189 F. Supp. 3d 581 (E.D. Va. 2016) ............... 3

*Malpiede v. Townson*,
　780 A.2d 1075 (Del. 2001) ............... 12, 19, 26

*Robbins v. Oklahoma*,
　519 F.3d 1242 (10th Cir. 2009) ............... 14

Rules

Federal Rule of Bankruptcy Procedure 7012(b) .......................................................... 4, 9

Federal Rule of Civil Procedure 8 ...................................................................... 11, 13

Federal Rule of Civil Procedure 12 ................................................................... 4, 9, 11

Defendants Matthew Nass, Matthew Place, Joshua Utter-Leyton, John Conbere, and Luis Scott-Vargas ("Defendants"), by and through undersigned counsel, hereby submit this Memorandum of Law in support of their Motion to Dismiss Counts Four and Five of West Realm Shires Services, Inc.'s ("Plaintiff" or "WRS") Adversary Complaint filed contemporaneously herewith and respectfully state as follows:

### PRELIMINARY STATEMENT AND SUMMARY OF ARGUMENT

A wise person once wrote that a cynic is someone "who knows the price of everything, and the value of nothing."[2]  That adage well describes Plaintiff's Complaint.

The video game industry is a booming economic sector.  One analysis from around the time that Plaintiff made the investment at issue here concluded that "[t]he global video game market size was valued at **USD 188.73 billion in 2021** and is **projected to grow from USD 199.74 billion in 2022 to USD 307.19 billion by 2029**…."[3]  Another more recent overview[4] *raised* those targets, and summarized these key metrics from the 2024 market:

- In 2024, the Video Games market is projected to reach a revenue of **US$282.30bn**.
- It is expected to **grow at an annual rate of 8.76%** between 2024 and 2027, resulting in a projected market volume of **US$363.20bn by 2027**.
- By 2027, the number of users in the Video Games market is expected to reach **1,472.0m users**.
- The user penetration rate is predicted to increase from **16.9% in 2024 to 18.5% by 2027**.

---

[2] Oscar Wilde, *Lady Windermere's Fan*, Act 3 (1892).

[3] *Video Game Market Size, Share & COVID-19 Impact Analysis*, Fortune Bus. Insights (Dec. 16, 2024), https://www.fortunebusinessinsights.com/video-game-market-102548 (last visited Jan. 3, 2025) (emphasis added).

[4] *Video Games – Worldwide*, Statista, https://www.statista.com/outlook/dmo/digital-media/video-games/worldwide (last visited Jan. 3, 2025) (emphasis added).

By any measure, Plaintiff's Complaint is the embodiment of how Wilde defined cynicism—based, as it is, on fundamentally flawed and, in many cases, outright false characterizations of a business deal for a hugely promising opportunity in a mushrooming market.  Defendants had a remarkable track record of successes in the gaming world and, at the time of the deal, had created a game that was already meeting with huge success before its official release with the promise of untold additional upside potential.  Plaintiff made this investment at a time when its net worth was in the tens of billions of dollars, for what was effectively pocket change.

It is true that Defendants' game—*Storybook Brawl*—was in the beta-testing phase when FTX declared bankruptcy and was taken over by new management.  But so what?  Numerous software successes (e.g., Gmail) spend years in beta-testing before they are "officially launched."[5]  It is thus perhaps a reflection of Plaintiff's cynicism, or perhaps short-sightedness, or perhaps lack of familiarity with the videogame marketplace, that the Complaint would include an allegation that Defendants "never actually progressed past beta-testing[,]" (D.I. 1 ¶ 7) as though that made any difference, and as though Plaintiff's own indifference—once new management was running FTX—was not the reason why.

Plaintiff would prefer to ignore that, pre-bankruptcy, FTX/WRS's management had made prescient investments in cutting-edge technology companies.  For instance, FTX's 2021 investment in Anthropic, an AI company, initially gave it a 13.56% equity stake and the value of

---

[5] Miguel Helft, *Google to Launch New Web Browser*, N.Y. Times (July 7, 2009), https://www.nytimes.com/2009/07/08/technology/companies/08google.html (last visited Jan. 3, 2025).

its investment subsequently skyrocketed to the point where the Debtor sold only some of those shares for $880 million.[6]

While Plaintiff appears to contend that everything that happened at FTX before November 2022 was wrongful, the investment in Good Luck Games ("GLG") was actually a very astute move. The fact that Plaintiff did not know what to do with the investment and drove the company into the ground rather than continue to nurture it does not make the initial investment a wrongful act.

And while the Complaint goes on at length with irrelevant allegations about Sam Bankman-Fried ("Bankman-Fried"), this action seeks nothing from him. Rather, it is directed at the creative team that made up GLG and agreed to a merger with FTX/WRS. Defendants are being sued for having the temerity to do this deal, which Plaintiff paints as aiding and abetting their *counterparty's* alleged breach of fiduciary duty. For the reasons set forth below, Defendants respectfully submit that at least two (Counts Four and Five) of the five counts of the Complaint are legally improper and should be dismissed at the motion to dismiss stage. Defendants look forward to the opportunity to address the remaining counts at a later date. *See Maass v. Lee*, 189 F. Supp. 3d 581, 587-88 (E.D. Va. 2016) ("[T]he clear consensus among courts is that Rule 12(a)(4) clearly contemplates that any motion under Rule 12, whether it is to dismiss the entire [c]omplaint or only portions of the Complaint, suspends the time for the moving defendant to respond to the remainder of the complaint.") (internal quotation marks and

---

[6] Jonathan Stempel, *Crypto Exchange FTX to Sell Shares in AI Startup Anthropic*, REUTERS (Feb. 22, 2024), https://www.reuters.com/technology/crypto-exchange-ftx-sell-shares-ai-startup-anthropic-2024-02-22/ (last visited Jan. 3, 2025). *See also FTX Sells Majority of Its Shares in AI Startup Anthropic Ahead of Sam Bankman-Fried's Sentencing*, DATACENTER DYNAMICS (March 26, 2024), https://www.datacenterdynamics.com/en/news/ftx-sells-majority-of-its-shares-in-ai-startup-anthropic-ahead-of-sam-bankman-frieds-sentencing/ (last visited Jan. 3, 2025).

citations omitted). *Barbagallo v. Marcum LLP*, 820 F. Supp. 2d 429, 443 (E.D.N.Y. 2011) ("[I]n the interest of judicial economy and avoiding piecemeal answers, 'a partial motion to dismiss will suspend the time to answer those claims or counterclaims that are not subject to the motion.'") (quoting *Gortat v. Capala Bros., Inc.*, 257 F.R.D. 353, 366 (E.D.N.Y. 2009)).

In short, Counts Four and Five of the Complaint should be dismissed under Federal Rule of Civil Procedure 12(b)(6) and Federal Rule of Bankruptcy Procedure 7012(b) for failure to state a claim because:

(1)    Plaintiff has failed to plausibly allege that any of the Defendants aided and abetted an alleged breach of fiduciary duty by Bankman-Fried; and

(2)    Delaware does not recognize a claim for aiding and abetting corporate waste.

<u>**NATURE AND STAGE OF PROCEEDINGS**</u>

On or about November 8, 2024, Plaintiff filed this Adversary Complaint against Mr. Nass, Mr. Place, Mr. Utter-Leyton, Mr. Conbere, and Mr. Scott-Vargas.  D.I. 1.  The Complaint asserts claims for, *inter alia*, aiding and abetting Bankman-Fried's alleged breach of fiduciary duty and aiding and abetting corporate waste under Delaware state law against all of the Defendants.  Pursuant to an agreement between the Parties, this Motion is due on January 8, 2025.  D.I. 4.

**I.    <u>STATEMENT OF FACTS</u>[7]**

Without differentiating between which of the five named Defendants allegedly did what, Plaintiff asserts that "Defendants" aided and abetted Bankman-Fried's alleged breach of fiduciary duty to WRS because, according to Plaintiff, Defendants got too good of a deal when

---

[7] At the motion to dismiss stage, all facts pleaded in the complaint must be taken as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  *See infra* Section II(A) (Legal Standard).

they sold their company, GLG, including the intellectual property for the game *Storybook Brawl*, to WRS.

The Complaint alleges that Mr. Nass and Mr. Place formed an independent video game development studio, GLG, in 2019 and began developing the digital trading card game, *Storybook Brawl*, in February 2020.  D.I. 1 ¶ 36.  As Mr. Scott-Vargas explained, "[t]he one-sentence way to describe *Storybook Brawl* is that you draft your [card] decks, then instead of playing them, the computer plays them against each other and you see who wins.  The drafting is the fun part, and this [game] captures that fun extremely well."[8]  This type of game is called an "auto battler" and in 2021-22 was "a new and wildly popular genre of online game."[9]  *Auto Chess*, released in 2019, was at the forefront of this type of game, and "*Storybook Brawl* [and others] [] further refined the genre."[10]

GLG launched the game in beta format on Steam Early Access[11] "about 14 months later, which is incredibly fast for any game project, early access or not."[12]  A leading publication in the

---

[8] Luis Scott-Vargas, *An Introduction to Storybook Brawl (Sponsored)*, TCGPLAYER (June 16, 2023), https://infinite.tcgplayer.com/article/An-Introduction-to-Storybook-Brawl-Sponsored/a03ece3a-20e1-4663-9ae8-297cfba74a4c/ (last visited Jan. 3, 2025).

[9] *See generally* Budijono et al., *LUDUS: An Optimization Framework to Balance Auto Battler Cards*, PROCEEDINGS IN THE THIRTY-SIXTH AAAI CONFERENCE ON ARTIFICIAL INTELLIGENCE (2022), available at https://cdn.aaai.org/ojs/21550/21550-13-25563-1-2-20220628.pdf.

[10] *Id.*

[11] Steam is an online video game distribution platform, which by 2021 had over 132 million monthly active users.  *See Steam - 2021 Year in Review*, STORE.STEAMPOWERED.COM (March 8, 2022), https://store.steampowered.com/news/group/4145017/view/3133946090937137590 (last visited Jan. 3, 2025).

[12] Thomas Wilde, *Preview: 'Magic' pros and 'Hearthstone' vets team up for card-game auto-battler 'Storybook Brawl'*, GEEKWIRE (Aug. 20, 2021), https://www.geekwire.com/2021/preview-magic-pros-hearthstone-vets-team-card-game-auto-battler-storybook-brawl/ (last visited Jan. 3, 2025).

videogame industry, GeekWire, lavished praise on *Storybook Brawl*, noting that it had a "solid, addictive quality to it," and that "[w]hat got [our] attention about *Storybook Brawl* in the first place was its pedigree."

> Its development team is headed up by Matthew Place, the former lead designer for the first three sets of Blizzard's digital card game *Hearthstone* and the *World of Warcraft* trading card game. The team also includes Josh Utter-Leyton, a former *Magic: The Gathering* pro, working as an engineer, and Matt Nass, who has five *Magic* Grand Prix wins under his belt, coding the client.
>
> They also recently added *Magic* hall of famer Luis Scott-Vargas as Good Luck's vice president of marketing. The team currently consists of 7 full-time members, with art and 3D modeling tasks handled by a variety of contractors.[13]

According to the Complaint, in November 2021, Bankman-Fried introduced Mr. Nass to FTX senior employees as his friend and the cofounder of *Storybook Brawl*. D.I. 1 ¶ 37. There is no suggestion that Mr. Nass somehow wrongfully sought out this meeting or improperly persuaded Bankman-Fried to make the introduction. The Complaint also alleges that, in December 2021, FTX flew Mr. Nass, Mr. Place, and Mr. Utter-Leyton to FTX's headquarters for negotiations regarding the sale of GLG. *Id.* at ¶ 38. Again, there is no allegation that the Defendants did anything improper in being flown to the FTX headquarters to conduct negotiations – which nowhere in the Complaint does Plaintiff allege were anything other than arm's length. Indeed, Plaintiff does not assert that there was anything improper at all about Defendants' negotiations with FTX/WRS, except to irrelevantly aver that the negotiations "were scheduled to take place" over a week in December, and that on December 11, Bankman-Fried announced on Slack: "We have agreed to acquire Storybook Brawl! $25m. Will likely be FTX US." *Id.* Plaintiff alleges that Bankman-Fried and Mr. Nass signed a "one-page term sheet" on

---

[13] *Id.*

that date.  *Id.*  However, while the initial term sheet may have been signed on December 11, 2021, the deal, which was overseen by "a number of legal advisors" "retained" by WRS, did not close for another 2.5 months.  D.I. 1 ¶¶ 38, 41, 48.

During those intervening months, FTX established its new gaming unit, which was "aimed at encouraging game publishers to embrace crypto currencies."[14]  In February 2022, FTX hired a former Warner Brothers Games executive to run the gaming unit.[15]  He was "responsible for helping developers integrate digital assets into their game, or launch tokens."[16]  FTX's stated objective through the gaming unit was to "put[] players first and creat[e] open economies powered by the blockchain that grant players true asset ownership" through non-fungible tokens ("NFT").[17]

On March 1, 2022, the merger closed.  Reflecting the participation of legal advisors, the transaction followed typical corporate procedures (including the creation of a Merger Sub[18]), and the Merger Agreement comprised standard definitions and closing terms.  *Id.* at ¶¶ 41-46.

---

[14] Jamie Crawley, *FTX Starts Gaming Unit to Promote Crypto Adoption: Report*, COINDESK (May 11, 2023), https://www.coindesk.com/business/2022/02/21/ftx-starts-gaming-unit-to-promote-crypto-adoption-report (last visited Jan. 3, 2025).

[15] Sam Reynolds, *FTX Hires Former WB Gaming Exec to Lead Gaming Partnerships*, COINDESK (May 11, 2023), https://www.coindesk.com/business/2022/03/10/ftx-hires-former-wb-gaming-exec-to-lead-gaming-partnerships (last visited Jan. 3, 2025).

[16] *Id.*

[17] *Id.*

[18] A "merger sub" is a "subsidiary formed by a party for purposes of effecting a form of indirect merger, such as a forward triangular merger or reverse triangular merger.  In a forward triangular merger, the target company is merged with and into the acquiror's merger subsidiary.  In a reverse triangular merger, the merger subsidiary is merged with and into the target company."  Board Resolutions of Merger Subsidiary, Practical Law Standard Clauses (Glossary) 9-382-8521; 9-382-3627.

The merger met with enthusiasm in the tech publications.  One leading publication reported that "it's easy to understand how the [FTX/WRS] leadership involved might see Good Luck Games as a possible golden ticket to widespread acceptance" for FTX's new gaming unit.[19] The article praised Defendants as "a pool of in-house advisors tasked with helping FTX Gaming" "care about the right stuff."[20]  It was further noted that the "aim of the acquisition [was] reportedly to use Storybook Brawl as a testbed, in order to find ways to integrate blockchain technologies into video games without turning off those games' audience."[21]  While the gaming community's initial rejection of new technology, such as adding NFTs to games, is legendary, there were "398 active blockchain games as of January 2022, up 92% from a year previously."[22] And by the end of 2023, an NFT in the wildly popular NFT-based trading card game, *Axie Infinity*, "sold for more than $800,000, while a plot of digital land in the *Axie Infinity* metaverse fetched more than $2.3 million."[23]

---

[19] Michael Gariffo, *Exclusive: FTX buys Good Luck Games in quest to convince gamers to love NFTs and blockchain*, ZDNET (March 22, 2022), https://www.zdnet.com/finance/blockchain/exclusive-ftx-buys-good-luck-games-in-quest-to-convince-gamers-to-love-nfts-and-blockchain/ (last visited Jan. 3, 2025).

[20] *Id.*

[21] Thomas Wilde, *'Storybook Brawl' developer acquired by crypto exchange firm FTX*, GEEKWIRE (March 22, 2022), https://www.geekwire.com/2022/storybook-brawl-developer-acquired-by-crypto-exchange-firm-ftx/ (last visited Jan. 3, 2025).

[22] Jamie Crawley, *FTX Starts Gaming Unit to Promote Crypto Adoption: Report*, COINDESK (May 11, 2023), https://www.coindesk.com/business/2022/02/21/ftx-starts-gaming-unit-to-promote-crypto-adoption-report (last visited Jan. 3, 2025).

[23] Matthew DiLallo, *Investing in NFT Trading Cards: A closer look at how to invest in NFT trading cards*, THE MOTTLEY FOOL (Nov. 17, 2023), https://www.fool.com/investing/stock-market/market-sectors/financials/non-fungible-tokens/nft-trading-cards/ (last visited Jan. 3, 2025).

On November 11, 2022, eight months after the acquisition and before *Storybook Brawl* was ready for official release, FTX declared bankruptcy.  D.I. 1 ¶ 57.  GLG, then a subsidiary of WRS, also filed for bankruptcy on that date.  *Id.*  FTX's new management left the promising opportunity of *Storybook Brawl* to die, and GLG shut down the game's servers on May 1, 2023. *Id.*

Now, nearly three years since the Merger Agreement was signed, Plaintiff alleges not only that the terms of the Merger Agreement resulted in "constructive fraudulent transfers" to each Defendant,[24] but also that Bankman-Fried wasted corporate assets and breached a fiduciary duty to WRS by entering into the Merger Agreement, which each Defendant somehow "aided and abetted."  Because Plaintiff's aiding and abetting counts (Counts Four and Five) are wholly deficient and not grounded in fact or law, the Court should dismiss them.

## II.    ARGUMENT

### A.    Legal Standard

"Fed.R.Civ.P. 12(b)(6), made applicable by Fed.R.Bankr.P. 7012(b), governs a motion to dismiss for failing to state a claim upon which relief can be granted."  *In re Tropicana Ent., LLC*, 520 B.R. 455, 466-67 (Bankr. D. Del. 2014).  "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*, 556 U.S. at 678 (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "Mere conclusory allegations are insufficient to state a plausible claim for relief.  The complaint must contain sufficient facts allowing the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *In re Live Well Fin., Inc.*, No. 19-11317

---

[24] While defendants understand that it would not be procedurally appropriate in a Rule 12 Motion, at the appropriate time, each Defendant will show that the constructive fraudulent transfer allegations are utterly without merit.

(LSS), 2023 WL 4025816, at *2 (Bankr. D. Del. June 14, 2023) (internal footnote and quotations

omitted).  As explained by this Court, the claims alleged must not be "only possible," but

plausible; thus, "the sheer possibility of liability is not enough."  *In re Cred Inc.*, 650 B.R. 803,

814 (Bankr. D. Del. 2023); *Malpiede v. Townson*, 780 A.2d 1075, 1083 (Del. 2001) ([T]he trial

court is not required to accept every strained interpretation of the allegations proposed by the

plaintiff….").

> **B.     Count Four:  Plaintiff has not plausibly alleged that any one of the five
> individual defendants aided and abetted any breach of fiduciary duty.**

>> **1.     Count Four should be dismissed because Plaintiff lumps all the
>> Defendants together and thus does not satisfy the pleading standard
>> under F.R.C.P. 8.**

In Count Four, Plaintiff sweepingly alleges that "Defendants" aided and abetted a breach

of fiduciary duty yet fails to state any facts against any particular Defendant that would support a

cause of action against any individual Defendant.  Instead, it broadly employs a "group pleading"

strategy, impermissibly lumping all five Defendants together to advance a single theory of

collective responsibility.  But as courts have made clear, "plaintiffs cannot combine allegations

against multiple defendants."  *T-Jat Sys. 2006 Ltd. v. Expedia, Inc. (DE)*, C.A. No. 16-581-RGA-

MPT, 2017 WL 896988, at *7 (D. Del. Mar. 7, 2017) (report and recommendation) (citing *M2M*

*Sols. LLC v. Telit Commc'ns PLC*, C.A. No. 14-1103-RGA, 2015 WL 4640400, at *3 (D. Del.

Aug. 5, 2015)).

Indeed, "allegations lumping multiple defendants together without providing allegations

of individual conduct are frequently … insufficient to satisfy the notice pleading standard."

*Adverio Pharma GmbH v. Alembic Pharms. Ltd.*, C. A. No. 18-73-LPS, 2019 WL 581618, at *6

(D. Del. Feb. 13, 2019).  As a recent Delaware district court observed, "[f]air notice under Rule

8(a)(2) depends on the type of case … [I]t is particularly important in [some] circumstances that

the complaint make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations[.]" *Id.* (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1249-50 (10th Cir. 2009)) (emphasis in original).  For example, "a claim for breach of fiduciary duties may be dismissed where the complaint (1) lumps all of the individual Defendants together … without supplying specific facts as to each defendant's wrongdoing; (2) has not provided any specific facts as to which transactions a particular defendant authorized; and (3) does not allege what authority any particular defendant had to approve such transactions." *In re Furniture Factory Ultimate Holding, L.P.*, No. 20-12816 (JKS), 2023 WL 5662747, at *10 (Bankr. D. Del. Aug. 31, 2023) (quoting *In re Conex Holdings, LLC*, 514 B.R. 405, 414 (Bankr. D. Del. 2014)) (quotation marks omitted).

Aiding and abetting claims must be averred with at least a minimum level of specificity to survive a Rule 12 Motion.  Allegations that are "vague and lack sufficient detail about which [defendants] knowingly participated in the [transaction]" cannot establish an aiding and abetting claim.  *In re Troll Comm'cns, LLC*, 385 B.R. 110, 120 (Bankr. D. Del. 2008).  To "meet Rule 8's requirements," Plaintiff must explicitly indicate *what each Defendant* is alleged to have done to aid and abet the underlying breach.  *ECB USA, Inc. v. Savencia, S.A.*, No. CV 19-731-RGA-CJB, 2020 WL 11762200, at *22 (D. Del. July 10, 2020) (report and recommendation) (applying Florida law).

Plaintiff provides no such specificity.  Rather, it asserts vague, sweeping allegations against all Defendants, conflating the Defendants' knowledge, conduct, and even alleged preexisting relationships under one umbrella.  Plaintiff also cynically tries to tar Defendants simply by association with the notorious Bankman-Fried, baldly alleging that "Defendants"

"knowingly participated in Bankman-Fried's breach of [his] fiduciary duty to WRS" because "Defendants" "knew that Bankman-Fried personally benefitted from the transfers by benefiting Defendants, his childhood friends"[25] and "knew that the transfers did not provide and had virtually no prospect of providing WRS with reasonably equivalent value[.]"  D.I. 1 ¶ 94.

Plaintiff at no point identifies what each individual Defendant allegedly knew or how he or they participated in Bankman-Fried's alleged breach.  In fact, Plaintiff barely even refers to some of the Defendants beyond the wholly benign assertion that each Defendant received payment from WRS.  *See id.* ¶¶ 12-16, 53.  Beyond that, for example, while named as a Defendant, Mr. Conbere is *never again* mentioned in the Complaint.  Mr. Utter-Leyton is only referenced *one additional time*, as a member of the GLG team that flew to FTX headquarters for negotiations.  *See id.* ¶ 38.  The Complaint does not detail any statements or actions he made during these negotiations, let alone allege any wrongful conduct by him.  Mr. Scott-Vargas is mentioned twice more:  once in reference to a comment he allegedly made about his bonus payments, and once in reference to an allegation involving payment to his brother.  *See id.* ¶¶ 54.

Mr. Place is referenced three additional times:  as Bankman-Friend's alleged childhood friend, as having been a part of the GLG team that flew to FTX's headquarters for negotiations, and as having expressed excitement about the bonuses, as though these were somehow ominous facts.  *See id.* ¶¶ 35, 38, 54.  Like Mr. Utter-Leyton, the Complaint does not assert *what* Mr. Place said or did during these negotiations, let alone aver any particular wrongful conduct by him.  Even Mr. Nass, whom Plaintiff treats as the "ringleader" in the negotiations, is merely

---

[25] Although premature for the Court to consider at the pleading stage, Defendants are duty-bound to advise the Court of the falsity of this allegation, which unfortunately appears repeatedly throughout the Complaint.  Before the transaction at issue in this case, only Mr. Nass of the Defendants was personally acquainted with Bankman-Fried.

alleged to have:  (1) a personal relationship with Bankman-Fried as his godbrother, (2) been part

of the GLG team flown to FTX's headquarters, (3) been listed on the Merger Agreement, (4)

expressed excitement about the bonuses, and (5) tried to buy back Storybrook Brawl after FTX

declared bankruptcy.  *See id.* ¶¶ 34, 38, 41, 54, 57-58.  Even under the liberal pleading standards

of the Federal Rules of Civil Procedure, none of those assertions properly states a cause of

action.

The two preceding paragraphs set forth the totality of the allegations against the

individual Defendants.  All other allegations against Defendants are just that:  allegations against

the collective Defendants.  The few factual allegations included in the Complaint regarding the

individual Defendants fail to establish what each Defendant knew or did at any stage in the

negotiation or transaction process.  As such, Plaintiff has failed to provide sufficient and fair

notice to Defendants about the particular claims against them as required by Rule 8.

Accordingly, this Court should dismiss Count Four.

> ## 2. Count Four should also be dismissed because Plaintiff does not plausibly allege that any of the Defendants "knowingly participated" in a breach of fiduciary duty.

Even if Plaintiff satisfied Rule 8's notice pleading standard, and even if it had properly

pleaded that Bankman-Fried breached his fiduciary duty,[26] it failed to plausibly allege that any of

---

[26] Defendants do not concede that Plaintiff sufficiently pleaded that Bankman-Fried breached a fiduciary duty.  Among other things, the Complaint fails to allege that Bankman-Fried violated: (1) any duty of due diligence where, per the Complaint, the merger transaction was handled by legal advisors retained by WRS; or (2) any duty of loyalty or good faith where Plaintiff fails to specify how Bankman-Fried benefited from the transaction or subsequent payments.  *See, e.g.*, *In re Alchemy, LLC*, 2019 WL 4447541, at *10-*15 (Bankr. D. Del. Sept. 16, 2019).  Nor does Plaintiff allege the "overpayment incentives so the Court can analyze the effects of the challenged transactions in the aggregate," as required to proceed on a breach of fiduciary duty claim relying on overpayment.  *See Chester Cty. Employees' Ret. Fund v. New Residential Inv. Corp.*, 2016 WL 5865004, at *12 (Del. Ch. Oct. 7, 2016), *aff'd*, 186 A.3d 798 (Del. 2018); *In re*

the Defendants aided and abetted Bankman-Fried's alleged breach of fiduciary duty.  Under

Plaintiff's theory of liability, a representative of a target company could be liable for aiding and

abetting by negotiating or accepting favorable merger terms and being friends with the acquiring

company's CEO.  But this theory is contrary to Delaware law.

Delaware's test for aiding and abetting a breach of fiduciary duty is well-established and

requires:  "(1) the existence of a fiduciary relationship, (2) a breach of the fiduciary's duty, …

(3) knowing participation in that breach by the defendants, and (4) damages proximately caused

by the breach."  *In re Mindbody, Inc., Stockholder Litig.*, No. 484, 2023, 2024 WL 4926910, at

*31 (Del. Dec. 2, 2024) (citing *Malpiede v. Townson*, 780 A.2d 1075, 1096 (Del. 2001)).  In

short, a plaintiff must plead sufficient facts making it plausible on its face that the third-party

"knowingly participated" in the fiduciary's breach of duty and that the "participation"

"constituted substantial assistance in causing the breach."  *In re Oracle Corp. Derivative Litig.*,

No. CV 2017-0337-SG, 2020 WL 3410745, at *11 (Del. Ch. June 22, 2020).  This is not an easy

test to satisfy, and an aiding and abetting claim's viability often turns on whether a plaintiff

adequately pleads scienter and substantial assistance.  *In re Mindbody, Inc.*, 2024 WL 4926910 at

*32.  Here, as shown below, Plaintiff does not do so and thus Count Four should be dismissed on

this basis as well.

### a.   Plaintiff does not plead that any Defendant substantially assisted any breach of fiduciary duty.

A plaintiff must plead facts that the defendant's "assistance to the primary actor

constituted substantial assistance in causing the breach."  *In re Oracle Corp.*, 2020 WL 3410745,

at *11.  "Substantial assistance" "requires more than the passive awareness of a fiduciary's

_____

*Our Alchemy, LLC*, 2019 WL 4447541, at *13 (relying on *Chester County*).  Count Four should
be dismissed on this basis as well.

disclosure breach." *In re Mindbody, Inc.*, 2024 WL 4926910 at *33, *40-41 (finding no substantial assistance where the defendant "did not create an informational vacuum, or purposely mislead [the fiduciary], or proximately cause his disclosure breach").  Delaware courts may (though are not required) to consider the following when assessing whether assistance or participation is "substantial":

> [t]he nature of the tortious act that the secondary actor participated in or encouraged, including its severity, the clarity of the violation, the extent of the consequences, and the secondary actor's knowledge of these aspects and the amount, kind, and duration of assistance given, including how directly involved the secondary actor was in the primary actor's conduct.

*In re Oracle Corp.*, 2020 WL 3410745 at *11 (cleaned up).

Here, Plaintiff does not assert that any of the Defendants "substantially assisted" Bankman-Fried's alleged breach of fiduciary duty to WRS.  Paragraph 94 of the Complaint just states that "Defendants" "knew" that WRS overpaid for Storybook Brawl (Defendants do not agree that WRS overpaid) and that they "knew" Bankman-Fried would somehow personally and wrongfully benefit by "benefiting … his childhood friends."  D.I. 1 ¶ 94.  Plaintiff baldly asserts: "Defendants thus knowingly participated in Bankman-Fried's breaches of fiduciary duty to WRS."  *Id.*  The word "thus" is doing heavy lifting in that sentence, as Plaintiff alleges only a "passive awareness" rather than the "active participation or affirmative action" required for "substantial assistance."  *In re Mindbody, Inc.*, 2024 WL 4926910 at *33, *40-41; *In re Cred Inc.*, 650 B.R. 803, 828 (Bankr. D. Del. 2023), *aff'd*, 658 B.R. 783 (D. Del. 2024).

Further, merely accepting payments made pursuant to a negotiated Merger Agreement (handled by counsel for WRS), a salary, and discretionary bonuses, does not constitute "substantial assistance."  Claims of aiding and abetting a fiduciary duty in the context of a merger or acquisition generally involve the defendant actively exploiting a conflict of interest

between the fiduciary and the board or pressuring or misleading the fiduciary.  *E.g.*, *In re Am. Bus. Fin. Servs., Inc.*, 360 B.R. 74, 81 (Bankr. D. Del. 2007); *In re Mindbody, Inc.*, 2024 WL 4926910 at *33.  Here, there is no allegation that any or all the Defendants took unfair advantage of Bankman-Fried or pressured him to make these payments.  Moreover, a conclusory statement that there "is no evidence that" GLG provided "sufficient" "business plans or financial projections" certainly does not permit an inference that GLG misled WRS's counsel or Bankman-Fried about GLG's finances during any negotiations.  D.I. 1 ¶ 48.  Plaintiff's allegations do no more than show its lack of understanding of the gaming industry, in particular why the industry's press recognized that GLG was FTX's "golden ticket."[27]

Plaintiff's Complaint wholly fails to state a claim that any of the Defendants aided and abetting any sort of fiduciary duty through the Merger Agreement or by passively accepting the salaries and bonuses offered to them.  Count Four should be dismissed.

### b.     Plaintiff does not plead that any Defendant knew that any conduct was improper.

Nor did Plaintiff plausibly allege that any Defendant acted with scienter, which is required to plead "knowing participation" and which imposes a stringent standard.  *Jacobs v. Meghji*, No. CV 2019-1022-MTZ, 2020 WL 5951410, at *8 (Del. Ch. Ct. Oct. 8, 2020).  "Knowing participation," is a "most difficult" element to prove and plead because a plaintiff must allege sufficient facts to allow for the inference that a third-party acted with:  (1) knowledge that the *fiduciary's* conduct breached his or her duty, and (2) knowledge that *their own* conduct was "legally improper."  *Id.*  Neither conclusory statements nor allegations or implications that a third party "should have known" is enough for a pleading to survive a motion

---

[27] *Gariffo*, *supra* note 18.

to dismiss.  *Capitaliza-T Sociedad De Responsabilidad Limitada De Cap. Variable v. Wachovia Bank of Delaware Nat. Ass'n*, No. CIV. 10-520 JBS KMW, 2011 WL 864421, at *5 (D. Del. Mar. 9, 2011) ("The universal rule requires actual knowledge of the tortious conduct by the wrongdoer, not merely that the defendant knew something was wrong in general.").

To the extent Plaintiff even pleaded a breach of fiduciary duty (Defendants do not agree that it did, *see supra* note 25), Plaintiff does not claim that Defendants knew that Bankman-Fried's conduct constituted a breach.  Plaintiff seems to contend that simply knowing that Bankman-Fried was the CEO of WRS is enough for a plausible inference that, by entering into the Merger Agreement, Defendants knowingly participated in his alleged breach of fiduciary duty.  But that is not the law.  *See Jacobs v. Meghji*, 2020 WL 5951410, at *11 (Mere knowledge that someone is a fiduciary "cannot give rise to the reasonable inference that [the third-party] knew [the fiduciary] infected, and the board permitted, a process in breach of their fiduciary duties.").

What Plaintiff essentially alleges is that the Defendants all knew that WRS overpaid for GLG and for their employment.  But even if that were so (it is not), it does not mean that they thought Bankman-Fried acted improperly by signing or complying with the Merger Agreement.  *Jacobs* is instructive.  There, the Delaware Court of Chancery dismissed a minority stockholder's claim for aiding and abetting breach of fiduciary duty against an investor/bidder who participated in an equity investment transaction with the company's controlling stockholder.  The defendant's bid was accepted by the company's board over a bid the plaintiff claimed was superior.  Among other allegations, the plaintiff claimed that the third-party "knew" the transaction was "unfairly structured" for the controlling stockholder's benefit, and "knew" that the terms were not "commercially typical."  *Id.* at *12-13.  The Court of Chancery rejected the plaintiff's conclusory

pleading as improperly attempting to punish a successful bidder for getting itself a "sweet" deal in an arms-length transaction. *Id.* at \*13. The *Jacobs* court further noted that, especially where the bidder engaged with a "special committee" that was created for the transaction and which had determined that the deal was in the company's best interests, there would have been no reason for the bidder to think that there was anything improper about the deal. *Id.*

Here, as did the bidder in *Jacobs*, GLG "had the right to secure for itself a favorable deal." *Id.* at \*12. And per the Complaint, GLG dealt with legal advisors retained by WRS (not Bankman-Fried) for 2.5 months before the Merger Agreement was finalized and signed. As such, there would have been no reason for them to suspect that there was something improper about the terms – or that Bankman-Fried breached any duty to WRS by signing the Merger Agreement. *See Malpiede v. Townson*, 780 A.2d 1075, 1097 (Del. 2001) (A deal resulting from arms-length negotiations "cannot give rise to liability for aiding and abetting.").

And if there was no reason for Defendants to think there was anything improper about the terms of the Agreement, there would be no reason for them to suspect that there was anything wrong with the payments made thereafter. Mr. Nass's alleged proposed buy-back offer a year later, after both companies filed for bankruptcy, certainly does not mean that any Defendant knew Bankman-Fried breached any fiduciary duty. As the Court in *Jacobs* explained, "[c]onsistent with longstanding principles of law and capitalism, [Defendants] exercised [their] right to secure … a 'sweet' deal." *Id.* at \*13.

Plaintiff does not and cannot allege that any Defendant acted with scienter, an essential element of its claim. Thus, Count Four should be dismissed.

### C.    Count Five:  Aiding and Abetting Waste of Corporate Assets

Because Delaware law does not recognize a claim for aiding and abetting waste of corporate assets, Plaintiff's Count Five must be dismissed.

Plaintiff, in conclusory fashion, asserts that the Merger Agreement was a waste of WRS's assets, which "Defendants" allegedly aided and abetted by "inducing [ Bankman-Fried] to cause WRS to invest into GLG at an inflated valuation."  Doc. 1, ¶¶ 97-98.  That is, Plaintiff asserts that the representatives of a target company can be liable to the acquiring company because subsequent owners of the acquiring company decide—well after-the-fact—that it paid too much for the acquisition.  It is no surprise that Delaware courts have never recognized such a theory of liability.

Defendants have found only one case in Delaware state or federal courts considering or even mentioning a claim for aiding and abetting corporate waste, and it is readily distinguishable. *See In re World Health Alts. Inc.*, 385 B.R. 576 (Bankr. D. Del. 2008).  In that 2008 case, the bankruptcy court denied the defendant's motion to dismiss an aiding and abetting claim.  The defendant who allegedly "aided and abetted" corporate waste was not, as are Defendants here, someone with no previous business relationship to Plaintiff.  Rather, the defendant was the debtor's vice president of operations and in-house general counsel, who allegedly—along with other defendants—"allowed the routine waste of [Debtor's] limited resources on expensive and unnecessary luxuries for their personal benefits."  385 B.R. at 583.  The bankruptcy court declined to dismiss the claim because the defendant, as the debtor's corporate officer and general counsel, was obligated to oversee and create guidelines for corporate expenditures.  *Id.* at 594.  And because the allegedly wasteful expenditures were incurred on his watch, yet he did nothing about it, the bankruptcy court permitted the aiding and abetting claim to proceed.  *Id.*  In making that decision, the bankruptcy court did not cite any Delaware (or other) authority supporting the existence of such a claim.  There is, thus, no legal basis for an aiding and abetting of corporate waste claim under Delaware law and Count Five must be dismissed.

Further, even if "aiding and abetting corporate waste" was a recognizable claim, Plaintiff's allegations are wholly distinguishable from the circumstances in *In re World Health*. Plaintiff does not and cannot allege that any of the Defendants had any knowledge of, involvement in, or responsibility to WRS.  Thus, even if aiding and abetting corporate waste was a legitimate theory of relief, Plaintiff's allegations do not support that any Defendant is committed such a violation.

Count Five is not grounded in law and should therefore be dismissed.

**III.**    **CONCLUSION**

For the foregoing reasons, the Court should dismiss the claims set forth in the Complaint against Defendants.

Dated:  January 8, 2025                **MONTGOMERY McCRACKEN WALKER & RHOADS LLP**

*/s/ Marc. J. Phillips*
Marc J. Phillips (No. 4445)
1105 North Market Street, 15th Floor
Wilmington, Delaware  19801
Telephone:  (302) 504-7800
mphillips@mmwr.com

-and-

Jeremy D. Mishkin (admitted *pro hac vice*)
1735 Market Street, 20th Floor
Philadelphia, Pennsylvania  19103
Telephone:  (215) 772-7246
jmishkin@mmwr.com

*Attorneys for Defendants*